IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez

Civil Action No. 19-cv-2345-WJM-KMT

MICHAEL SMITH,

    Plaintiff,

v.

CHEYENNE MOUNTAIN SCHOOL DISTRICT 12,

    Defendant.

---

### ORDER DISSOLVING TEMPORARY RESTRAINING ORDER, DENYING 20 U.S.C. § 1415(j) INJUNCTION, AND TERMINATING CASE

---

Plaintiff Michael Smith ("Smith"), proceeding *pro se*, files this lawsuit against Defendant Cheyenne Mountain School District 12 ("Cheyenne 12"). Smith's sole cause of action is claim for an injunction requiring Cheyenne 12 to continue educating his eleven-year-old autistic son, R.S., while Smith and Cheyenne 12 work through a dispute over R.S.'s "placement," as that term is understood under the Individuals with Disabilities in Education Act ("IDEA" or "Act"), 20 U.S.C. §§ 1400 *et seq*.

Currently before the Court is Smith's Verified Motion for Temporary Restraining Order and Preliminary Injunction ("Motion"). (ECF No. 3.) The Court previously granted the TRO portion of the Motion. (*See* ECF No. 9; *see also* ECF No. 17 (extending TRO).) The Court then called for and received further briefing on the remainder of the Motion. (*See* ECF Nos. 12, 16, 18.) Although the Court would normally hold a hearing on a matter such as this, the Court finds that a hearing would not help to resolve the questions presented because:

- Smith's complaint (ECF No. 1), Motion (ECF No. 3), and reply in support of the Motion (ECF No. 16) are all verified;
- Cheyenne 12's assertions of fact are made by way of declaration or affidavit (*see* ECF Nos. 12-1, 18-1, 19-1); and
- the parties' briefs do not raise any disputes of fact or issues of credibility.

Accordingly, the Court will rule on the papers. For the reasons explained below, the Court construes the preliminary injunction portion of the Motion as a request for a statutory "stay-put" injunction as provided for by IDEA (*see* 20 U.S.C. § 1415(j))—in contrast to an equitable injunction under Federal Rule of Civil Procedure 65. The Court finds that § 1415(j) relief is unavailable in these circumstances, however. The Court therefore denies the remainder of the Motion, dissolves the TRO, and terminates this case.

## I. BACKGROUND

Based on the record presented, the Court makes the following findings of fact.

R.S. does not live within Cheyenne 12's boundaries. When living with his father (*i.e.*, Plaintiff Smith), he lives in the Harrison School District ("Harrison"). (ECF No. 12-1 at 30, ¶ 2.)[1] When living with his mother, Ramona Smith, he lives in the Colorado Springs School District 11 ("C.S. 11"). (*Id.* at 32, ¶ 2.) Since beginning elementary school, R.S. has attended The Vanguard School ("Vanguard"), one of Cheyenne 12's charter schools. (ECF No. 1 ¶¶ 1, 9.) This is possible through Colorado's interdistrict school choice statute. *See* Colo. Rev. Stat. §§ 22-36-101 *et seq.*

---

[1] All ECF page citations are to the page number in the CM/ECF header, which does not always match the document's internal pagination. This is particularly true in filings that are actually a collection of multiple exhibits, such as ECF No. 12-1.

2

R.S.'s autism qualifies him for special education and related services, which are provided according to his IDEA-mandated Individualized Education Program ("IEP"). (ECF No. 1 ¶ 3.)  His most recent IEP is dated May 6, 2019, toward the end of his fifth-grade year.  (*Id.* ¶ 4; ECF No. 12-1 at 3–4.)  It names his "Home School" as Soaring Eagles Elementary (a Harrison school) and his "School of Attendance" as Vanguard. (*Id.* at 3.)  It describes in detail the effects of his autism, his needs, the amount of time he will spend in general versus special education classes, and the amounts and types of extra services he will receive.  (*Id.* at 5–24.)  The Court will provide more details from the IEP as they become relevant to the Court's analysis.[2]

On May 30, 2019, Vanguard's executive director e-mailed a letter to Smith stating that "Vanguard would have to continue to hire a paraprofessional to work full-time with [R.S.] in order to provide the services contained in [his] IEP during the 2019–20 school year.  As a result, The Vanguard School is denying [R.S.'s] enrollment for the 2019–20 school year."  (ECF No. 1 ¶ 7.)

On August 7, 2019, Smith filed "a Due Process Complaint with the Colorado Department of Education" contesting Vanguard's action.  (*Id.* ¶ 10.)[3]  By doing so, Smith invoked the IEP grievance process that IDEA requires states receiving funding under the Act to make available.  *See* 20 U.S.C. § 1415(a).  Smith's Due Process Complaint was "referred to Colorado's Office of Administrative Courts" and is currently pending. (ECF No. 1 ¶ 10.)

---

[2] Smith did not attach R.S.'s IEP to any of his filings.  Cheyenne 12 submitted it as an attachment to its response brief.  However, Smith relies on the May 6, 2019 IEP (*see, e.g.*, ECF No. 1 ¶¶ 5–6) and he nowhere contests the authenticity of the document submitted by Cheyenne 12.

[3] The record does not reveal what Smith did between May 30 and August 7, 2019.

3

R.S.'s first day of sixth grade at Vanguard—assuming he should have been enrolled—was August 14, 2019. (*Id.* ¶ 14.) "On those days when R.S. has been dropped off" at Vanguard, he has been "confined to an office, separated from his peers, and provided with no educational services." (*Id.* ¶ 15.)

On August 20, 2019, the Court entered the TRO, restraining Cheyenne 12 "from refusing to provide services to R.S. at The Vanguard School in accordance with R.S.'s IEP while Smith's Due Process Complaint (Colorado Office of Administrative Courts docket number 2019:133) is being adjudicated." (ECF No. 9 at 5.)

## II. NATURE OF 20 U.S.C. § 1415(j) RELIEF & LEGAL STANDARD

Smith's asserts a single cause of action. Specifically, he requests an injunction under 20 U.S.C. § 1415(j), which reads in relevant part as follows: "[D]uring the pendency of any proceedings conducted pursuant to this section [such as the Due Process Complaint] . . . the child shall remain in the then-current educational placement of the child . . . ." Section 1415(j) is often referred to as IDEA's "stay-put" provision and is generally "construed to impose an automatic statutory injunction requiring that the child's then-current educational placement be maintained" so that a school district cannot "effect[] unilateral change in a child's educational program." *Miller ex rel. S.M. v. Bd. of Educ. of Albuquerque Pub. Sch.*, 565 F.3d 1232, 1252 n.13 (10th Cir. 2009) (internal quotation marks omitted).

In this light, the plaintiff need not satisfy the traditional four-factor test for a preliminary injunction under Rule 65(a). *See, e.g.*, *Taylor F. ex rel. Jon F. v. Arapahoe Cnty. Sch. Dist. 5*, 954 F. Supp. 2d 1197, 1200 (D. Colo. 2013). Rather, the only questions are "What is the child's 'then-current educational placement'?" and "Has the

4

child's then-current educational placement been changed?" If the answer to the latter question is "yes," the injunction is mandatory for the duration of the state-created grievance process, including appeals. *See, e.g.*, *Joshua A. v. Rocklin Unified Sch. Dist.*, 559 F.3d 1036, 1040 (9th Cir. 2009) (stay-put injunction persists until appeals are exhausted).

Moreover, strictly speaking, there is no "preliminary" form of the stay-put injunction, to be followed by a "permanent" injunction after discovery and trial. The stay-put injunction is either entered or it is not, and the case is over (assuming it is the only claim for relief). Of course, there may be cases in which a record sufficient to determine "then-current educational placement" cannot be assembled fast enough to prevent some sort of irreparable harm to the child. In those cases, a true (equitable) TRO and/or preliminary injunction may be appropriate if the movant can satisfy the traditional test for such relief. But once the proper record has been assembled, the Court's task is not to apply the traditional factors for deciding whether to issue a permanent injunction, *see eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006), but simply to decide whether the child's "placement" has been unilaterally changed or not.

Previously, the Court found that Smith satisfied the equitable factors required for a TRO because, on the record as it then stood, (i) it appeared that Smith was likely to succeed to proving that Vaguard is R.S.'s "placement," (ii) R.S. was experiencing irreparable harm by being kept in a school office all day, (iii) the harm to R.S. outweighed the harm to Cheyenne 12, and (iv) a TRO was in the public interest. (*See* ECF No. 9.) Since then, the briefing and exhibits have fully framed the issue and there is no need to consider interim relief, *i.e.*, a preliminary injunction under Rule 65.

5

So, to repeat, the questions now before the Court are "What is the child's 'then-current educational placement'?" and "Has the child's then-current educational placement been changed?" Unfortunately, "[t]he IDEA does not define 'current educational placement.'" *Erickson v. Albuquerque Pub. Sch.*, 199 F.3d 1116, 1121 (10th Cir. 1999).

> [S]ome courts hold that the dispositive factor is the IEP in place when the stay-put provision is invoked. . . . [¶] Other circuits use a fact-driven approach in stay-put cases, defining educational placement as something more than the actual school attended by the child and something less than the child's ultimate educational goals.

*Id.* (internal quotation marks omitted). The Tenth Circuit has not itself provided a definition of "then-current educational placement," but it *has* provided a shortcut analysis: "An educational placement is changed when a fundamental change in, or elimination of, a basic element of the educational program has occurred." *Id.* at 1122. In other words, it may not be necessary to establish all the boundaries of the child's then-current educational placement. Rather, if the thing that has been fundamentally changed or eliminated is not a basic element of the IEP, then there has been no change of placement against which the § 1415(j) injunction would operate.

### III. ANALYSIS

In light of *Erickson*, the Court must ask whether education at Vanguard is a basic element of R.S.'s IEP. Sometimes a specific school is part of the "placement," *see, e.g.*, *A.K. ex rel. J.K. v. Alexandria City Sch. Bd.*, 484 F.3d 672, 679–82 (4th Cir. 2007), but frequently it is not, *see, e.g.*, *Rachel H. v. Hawaii Dep't of Educ.*, 868 F.3d 1085, 1089–93 (9th Cir. 2017); *Middleton v. District of Columbia*, 312 F. Supp. 3d 113, 130–31 (D.D.C. 2018); *Z.B. ex rel. Sanchez v. District of Columbia*, 292 F. Supp. 3d 300, 304–

6

06 (D.D.C. 2018).[4]

As described previously, the IEP identifies Vanguard as R.S.'s "School of Attendance," but this is in a summary section on the IEP's first page titled "Student and Family Information." (ECF No. 12-1 at 3.) There is no indication that this is meant as anything other than informational, along with other items listed in the same section (*e.g.*, "District of Residence," "Primary Disability," "Primary Language Spoken in the Home," etc.).

The only other mention of Vanguard is in a section titled "Service Delivery Statement," which sets forth specific plans for R.S.'s educational accommodations, such as "1:1 paraprofessional supports and accommodations for the majority of his classes," "120 minutes per month (approximately 30 minutes per week) of one-on-one [speech-language] therapy," and "Occupational Therapy services on a consultative (20 minutes per month) basis to address fine motor skills." (*Id.* at 22.) In that context, the IEP states, "[R.S.] has a Behavior Intervention Plan. The school psychologist consults with Vanguard staff on a regular basis to ensure that his needs continue to be met by his plan." (*Id.*)

The section of the IEP following the Service Delivery Statement is titled

---

[4] Emphasizing the word "location," Smith notes that 20 U.S.C. § 1414(d)(1)(A)(i)(VII) requires IEPs to specify "the anticipated frequency, location, and duration of [the] services and modifications" that the IEP will provide. (*See* ECF No. 16 at 7.) He further cites the Fourth Circuit's *A.K.* decision, *supra*, for the notion that failure to identify a particular school creates a defective IEP. (*Id.*) But the statute only requires the "anticipated . . . location." Necessarily, then, the location might be other than "anticipated." And even *A.K.* only goes so far as to say that "the school at which special education services are expected to be provided . . . *can be* a critical element for the IEP to address." 484 F.3d at 680 (emphasis added). *A.K.* does not say that the anticipated location *is always* a critical element. In fact, the Fourth Circuit took pains to "emphasize that we do not hold . . . that a school district could never offer a [IDEA-compliant education] without identifying a particular location at which the special education services are expected to be provided." *Id.* at 682. In other words, the location identified on the IEP (if there is one) is a factor to consider, but not dispositive.

"Recommended Placement in the Least Restrictive Environment (Special Education Setting)." (*Id.* at 23.) This is the only part of the IEP that directly references "placement." It contains a space for a narrative to "summarize discussions regarding placement option(s)." (*Id.*) As relevant to the question currently before the Court, that narrative includes the following:

> Representatives from [Harrison] and [C.S. 11] participated by phone for the entire additional IEP meeting as [those districts'] Special Education Directors' designees. [R.S.'s parents are residents of [Harrison] and [C.S. 11]. . . . The Director of Special Education from [Cheyenne 12] asked both representatives if Mr. Smith [the plaintiff here] were to enroll [R.S.] in either of their school districts, could the IEP (to include goals, services, 1:1 paraprofessional support, Least Restrictive Environment—what was discussed during the meeting) be implemented in their respective districts. Both representatives indicated that their districts would be able to implement the IEP.

(*Id.*) This prompted Smith to ask each representative "whether or not 6th grade would be elementary or middle school" in their districts. (*Id.*) The C.S. 11 representative said that sixth grade would be middle school, and the Harrison representative said that it depended on the student's address, because some Harrison elementary schools continued through sixth grade and some did not. (*Id.*)

Taking all this together, there is no indication that receiving services *at Vanguard* is "a basic element" of R.S.'s IEP. *Erickson*, 199 F.3d at 1122. Indeed, the IEP was specifically formulated for implementation by Cheyenne 12, Harrison, or C.S. 11. Smith responds, however, by elaborating on what apparently motivated the fifth-versus-sixth grade inquiry he made at the IEP meeting:

> R.S. is a 6th-grader at The Vanguard School, and has always attended that school. At all [Cheyenne 12] elementary schools, including The Vanguard School, elementary schools encompass grades k-6. In other words[,] R.S., by

8

> virtue of the k-6 structure at [Cheyenne 12], is one of the oldest and largest students in his school. R.S. is well-known, well-understood, and well-loved by his peers; they routinely perform acts of kindness for R.S. that are heartwarming. The peace-of-mind that comes to R.S. and his parents from this cannot be overstated, particularly given that [his] quirks and profound innocence, as symptoms of his autism, have in other situations left him vulnerable to bullying and abuse.
>
> . . . If R.S. were forced into [Harrison or C.S. 11], he would attend an unknown junior high school as a 6th-grader. He would be thrown into a mix of older, more sophisticated students with whom he is unfamiliar—students who are also unfamiliar with him. Given his quirks, his profound innocence, and this level of unfamiliarity, R.S. would be more vulnerable among this population, particularly given that he would be among the smallest and youngest of the group. He is likely to become anxious, fearful, and withdrawn in such an unfamiliar, different environment. Undoubtedly, such a dramatic shift would have a negative effect on R.S.'s learning experience.
>
> Concerns about R.S.'s well-being at an alternative school are justified. The Vanguard School offers a safe educational environment that is replicated nowhere else. The students wear school uniforms through grade 8. All students learn Latin beginning in 4th grade—a subject in which R.S. excels. Homework expectations are rigorous. And perhaps most importantly, there is a culture of respect among Vanguard students that exists nowhere else. School safety data from the Colorado Department of Education reveals that the junior high schools in the other proposed districts have disturbingly high rates of 1st, 2nd, and 3rd degree assault, vehicular assault, possession of dangerous weapons (such as guns and knives), destruction of school property, detrimental behavior, and other felonies. Incidents such as these are unheard of at Vanguard's elementary and junior high schools, but occur with disturbing regularity in the junior high schools of the proposed alternative school districts. Forcing R.S. to attend such schools will significantly affect his learning experience for the worse.

(ECF No. 16 at 8–9.)

The Court sympathizes with Smith and R.S. However, the question before the

Court is *not* where R.S. *should* go to school, or even whether R.S.'s IEP should be reformed to accommodate Smith's concerns. The only question is whether a § 1415(j) injunction must issue to allow R.S. to remain at Vanguard while his father pursues the Due Process Complaint. Unless Vanguard (or at least the environment it provides) is "a basic element" of R.S.'s IEP, *Erickson*, 199 F.3d at 1122, it is not part of his "then-current educational placement" and may not be part of any § 1415(j) injunction.

The only part of the IEP with any relevance to the advantages of Vanguard that Smith describes is a "Setting & Environment" subsection stating that R.S. needs "[a]ccess to a highly structured routine" and "[p]referential seating (side, near front, good peer model)." (ECF No. 12-1 at 9; *see also id.* at 19 (repeating this section verbatim).) As previously noted, however, the IEP states that representatives from Harrison and C.S. 11 confirmed their respective districts' ability to implement the IEP. Cheyenne 12 has also submitted affidavits from Harrison's and C.S. 11's respective directors of special education, each confirming what was documented in the IEP. (ECF No. 12-1 at 30–33; *see also* ECF No. 18-1 at 5–6.) Harrison's director opines that "the IEP developed for [R.S.] would provide him with a Free Appropriate Public Education ['FAPE'] and that Harrison District would have no difficulty in providing the services contained in that IEP and that he could receive FAPE pursuant to that IEP in the Harrison District." (ECF No. 12-1 at 30, ¶ 3.) C.S. 11's director says that "[i]f [R.S.] enrolls in District 11, District 11 will initially provide comparable services as written on his current IEP until it completes its own evaluation and develops an IEP based on his needs as identified through the evaluation process." (*Id.* at 32, ¶ 4.)

Although the affidavits are helpful, the ultimate question is what the IEP says and

fails to say.  The Court finds that Vanguard and/or its environment are not basic elements of the IEP.

Smith argues that the outcome here should match the outcome of a lawsuit brought by R.S.'s mother five years ago (presided over by U.S. District Judge Philip A. Brimmer), which raised a similar dispute regarding "placement" at Vanguard (then called Cheyenne Mountain Charter Academy ("CMCA"), *see* ECF No. 1 ¶ 1).  (*See Ramona Smith v. Cheyenne Mountain School District 12*, Case No. 14-cv-2651-PAB-CBS (D. Colo., filed Sept. 25, 2014).)  In a preliminary injunction posture, Cheyenne 12 argued to Judge Brimmer "that the stay-put provision did not require R.S. to continue his enrollment at CMCA because the Falcon School District [in which R.S. lived at the time, with his mother] could meet the educational requirements of [R.S.'s most recent] IEP." *Smith v. Cheyenne Mountain Sch. Dist. 12*, 2014 WL 5315033, at *3 (D. Colo. Oct. 17, 2014).  Judge Brimmer rejected this argument because, among other reasons, Cheyenne 12

> failed to present sufficient evidence supporting its claim that the Falcon School District could meet R.S.'s needs.  Based upon the evidence presented to the Court, to conclude that the Falcon School District could provide R.S. a free and appropriate public education as defined by the [R.S.'s] IEP would be pure speculation.

*Id.*  With no other evidence, Judge Brimmer reasoned that "[t]he fact that the . . . IEP lists CMCA as R.S.'s school of attendance and the fact that R.S. attended only CMCA in the time leading up to the filing of the due process complaint indicates that CMCA is R.S.'s current educational placement for purposes of the stay-put provision."  *Id.* at *2. Judge Brimmer therefore issued a § 1415(j) injunction.  *Id.* at *3.

Cheyenne 12 moved for reconsideration, presenting an affidavit from the Falcon

11

School District's director of special education stating that Falcon School District could implement R.S.'s IEP without problem. *See Smith v. Cheyenne Mountain Sch. Dist. 12*, 2015 WL 4979771, at *4 (D. Colo. Aug. 20, 2015). Judge Brimmer did not reject this affidavit as irrelevant—indeed, he acknowledged the possibility that education provided by a different school or district "can maintain the status quo" for stay-put purposes, so long as the current school or district provides appropriate evidence. *Id.* at *6 (citing cases). Judge Brimmer instead rejected the affidavit as inexcusably untimely:

> [D]efendant can hardly claim surprise that the Falcon School District's ability to maintain R.S.'s current educational placement was an issue at the preliminary injunction hearing. As a result, defendant does not justify its failure to present testimony from [the special education director] at the preliminary injunction hearing and, as a result, the Court finds it inappropriate to consider [the] affidavit in resolving the [motion for reconsideration].

*Id.* at *4.

Cheyenne 12 comes better prepared this time around. As noted, it has submitted affidavits from Harrison's and C.S. 11's respective directors of special education. (ECF No. 12-1 at 30–33; *see also* ECF No. 18-1 at 5–6.) But more importantly, the IEP itself—surely the place, if anywhere, that establishes the student's "then-current educational placement"—does not specify or even imply that Vanguard or the environment described by Smith is a basic element of R.S.'s IEP. Again, the IEP was intentionally formulated to be implemented in Cheyenne 12, Harrison, or C.S. 11. Consequently, R.S.'s "then-current educational placement" does not include being schooled specifically at Vanguard. The Court accordingly may not issue a § 1415(j) injunction requiring Cheyenne 12 to continue schooling R.S. at Vanguard during the adjudication of Smith's Due Process Complaint.

## IV. CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1. The preliminary injunction portion of Plaintiff's Verified Motion for Temporary Restraining Order and Preliminary Injunction (ECF No. 3), construed as a motion for a 20 U.S.C. § 1415(j) injunction, is DENIED;

2. The TRO issued August 20, 2019 (ECF No. 9) and extended on August 28, 2019 (ECF No. 17) is DISSOLVED effective immediately;

3. The Clerk shall enter judgment in favor of Defendant and against Plaintiff, and shall terminate this case; and

4. The parties shall bear their own costs.

Dated this 5th day of September, 2019.

BY THE COURT:

_____
William J. Martinez
United States District Judge